IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

**FILED**

JUL - 7 2017

Clerk, U.S. District Court
District Of Montana
Billings

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 17-33-BLG-SPW |
| Plaintiff, | |
| vs. | OPINION and ORDER |
| MASON LEE OSTER, | |
| Defendant. | |

On November 14, 2016, Defendant Mason Lee Oster led Yellowstone County Sheriff's Deputy Brandon Smart on a car chase, crashed his car, stole another car, crashed it, and attempted to flee on foot. He was unsuccessful and drugs and guns were found in his car. When he was later interviewed, he provided statements to law enforcement. Oster moves to suppress the incriminating evidence and statements. (Doc. 20).

Oster argues that because Deputy Smart's attempted seizure was illegal and provoked his flight, all the subsequent events that occurred after and evidence obtained must be suppressed. (Doc. 21 at 4-11). After considering the parties' briefing and exhibits, the Court DENIES the motion.

1

## I.    Background

At around 8:15 a.m. on November 14, 2016, Deputy Smart was dispatched to investigate a suspicious vehicle parked on a gravel road. The vehicle was reported to be a gray 1997 Nissan Maxima and a male was reportedly slumped over the steering wheel. (Doc. 20-2). When Smart found the car, he saw a male sitting in the driver's seat. (Doc. 20-1). When Smart pulled up parallel to the car, the driver started the car and began pulling away. Smart saw a female in the passenger seat sit up as the driver drove off. Smart waved his arm out of his window and yelled for the driver to stop to talk. The driver sped away. Smart turned his car around, activated his siren and overhead lights and pursued the car. (*Id.*).

The Maxima sped down the gravel road, across a highway, and continued fleeing. Smart followed the Maxima at speeds of 45-65 miles per hour. The dust from the gravel road was too thick for Smart to follow too closely. When the driver attempted to navigate a turn, he lost control of the car and drove off the road. (*Id.*).

When Smart caught up, he saw the male and female running from the Nissan and getting into a blue Chevy Suburban parked nearby. The male got in the driver's seat and they took off again down the road. Smart resumed his pursuit. As he was pursuing them, speeds again reached between 45-60 miles per hour on

2

the gravel roads. The driver made an abrupt left turn into a stubble field and began fleeing through the field. The field was too rough for Smart to navigate with his patrol car, so he advised dispatch he was discontinuing pursuit. He turned off his lights and siren and watched the Chevy flee across the field. Smart asked dispatch to check maps to see where the driver might come out. Based on dispatch's report, Lieutenant Kent O'Donnell advised he was in the area. (*Id.*).

O'Donnell saw a large cloud of dust from a vehicle traveling approximately two miles away. (Doc. 20-2). Shortly thereafter, he saw a blue Chevy Suburban head south away from him. He pursued the Suburban at speeds in excess of 60 miles per hour down a dead end road. The driver ran the Suburban through one barbed wire fence and stopped at the next fence. O'Donnell saw the male and female jump out of the Suburban and flee over another fence. He drove after them with his sirens and lights activated. He caught them as they were attempting to climb another fence. They gave up attempting to flee and began to hug and kiss. O'Donnell drew his Taser and ordered them back across the fence. As they were crossing the fence, the male and female continued to profess their love for each other. (*Id.*).

O'Donnell ordered them to lay face down, handcuffed them and placed them in the backseat of his truck. They continued to cry and profess their love for each other. According to O'Donnell, both looked sickly and on drugs. O'Donnell

3

identified the male as Mason Lee Oster and the female as Elizabeth Mary Ostwald. Oster was on probation and had an outstanding warrant for his arrest. O'Donnell asked Oster what the heck he was doing. Oster told O'Donnell that he loaned his car to a friend and did not know what the friend may have left in the car, so he got scared and ran. O'Donnell laughed and told Oster he was full of it. Oster told O'Donnell he knew there was drug paraphernalia in the car. When O'Donnell asked him who owned the Suburban, Oster said he didn't know and that he had just found the keys in it. (*Id.*).

Smart arrived and spoke with Oster, who was still in the backseat of O'Donnell's truck. (Doc. 20-1). Smart asked Oster if he wanted to give a recorded statement and Oster said yes. Smart read Oster the Miranda Warning and Oster agreed to provide a statement without an attorney present. (*Id.*).

Oster told Smart that he sped off because he was on probation and had a warrant for his arrest. He admitted to using drugs and admitted drugs and drug paraphernalia were in his car. He also admitted that guns were in his car, and that he suspected they were stolen, along with other stolen items in his car. He told Smart he had been out in the area looking for a place to ditch the stolen property so he did not get caught with it. Oster explained that he had loaned his car to a man and had just recently got it back. Oster said he met the man through Facebook and

4

thought he was from South Dakota and was running drugs back and forth between there and Billings. (*Id.*).

Two days later, Yellowstone County Sheriff's Office Detective Serge Paris and United States Postal Service Inspector Gregory Kosiarek interviewed Oster regarding stolen mail found in his Nissan. Oster read and signed the Advice of Rights and Waiver and agreed to be recorded. In the interview, Oster said he was going to get rid of everything in his car except the firearms, because he liked to shoot and hunt. He described the firearms as a .22 caliber pistol and a break away shotgun. He admitted he was a convicted felon and knew he could not legally possess a firearm.

## II. Discussion

Oster makes two arguments in support of his motion. First, Oster argues that Smart lacked reasonable suspicion to attempt to stop Oster when he initially found him on the dirt road. He argues that the pursuit resulted from this illegal seizure and so the evidence obtained thereafter must be suppressed. Second, Oster argues that he provided statements without being warned of his *Miranda* rights and his statements were involuntary, so they must be suppressed. The Court will address the arguments separately.

### A. Probable Cause for arrest existed when Oster was seized.

Oster argues that the question before the Court is whether Smart had reasonable suspicion to seize him when Smart waved his arm and attempted to stop Oster. (Doc. 21 at 5). But when a police officer attempts to seize a person and fails, the Fourth Amendment does not apply. *See Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845 n. 7 (1998) ("Attempted seizures of a person are beyond the scope of the Fourth Amendment."); *Brendlin v. California*, 551 U.S. 249, 255 (2007) ("A police officer may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission[.]"); *California v. Hodari D.*, 499 U.S. 621, 626 (1991) (A police pursuit in attempting to seize a person does not amount to a seizure within the meaning of the Fourth Amendment.)

Because Smart did not successfully seize Oster when Smart waved his arm for Oster to stop, the question of whether reasonable suspicion existed for the seizure does not begin there. Rather, it begins when Oster showed "actual submission," *Brendlin*, 551 U.S. at 255, which was when he stopped running from Lieutenant O'Donnell. *See id.* at 262 ("[A] fleeing man is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away.") At that point, Oster had committed criminal acts by driving recklessly at high speeds, stealing a vehicle, trespassing over private

property, and damaging private property. By the time O'Donnell seized him more than reasonable suspicion existed; probable cause existed for Oster's arrest.

### B.    Oster's statements were voluntary.

The United States does not intend to use Oster's non-*Mirandized* statements to Lieutenant O'Donnell, so no analysis on those statements is necessary. (Doc. 26 at 10). The only question remaining then, is whether Oster's *Mirandized* statements to Smart and Paris and Kosiarek were voluntary. The court finds they were.

The test for determining whether a statement was voluntary is "whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *United States v. Fisher*, 137 F.3d 1158, 1165 (9th Cir. 1998) (internal quotation omitted). The defendant's state of mind is not enough to render a statement involuntary. *Colorado v. Connelly*, 479 U.S. 157, 165-66 (1986). Instead, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" *Id*. at 167. Factors include (1) the defendant's youth; (2) the defendant's intelligence; (3) lack of advice of constitutional rights; (4) the length of detention; (5) the repeated and prolonged

nature of the questioning; and (6) the use of physical punishment such as deprivation of food or sleep. *United States v. Haswood*, 350 F.3d 1024, 1027 (9th Cir. 2003).

In reviewing the totality of the circumstances, the Court finds that Oster voluntarily provided his statement to Smart in O'Donnell's truck. Oster is an adult. O'Donnell advised Oster of his constitutional rights, and Oster agreed to give a statement. Oster has not raised any issue that leads the Court to believe he did not provide his statement to Smart voluntarily.

Additionally nothing in the recorded interview with Paris suggests Oster's will was overborne. Paris clearly read Oster his *Miranda* rights and Oster signed and dated the form. Oster intelligently answered Paris' questions. He explained to Paris that he did not want to keep identifying the person he loaned his car to because he had been threatened and was scared of him. Paris complied with his request and allowed Oster to identify the person by photograph.

Paris showed no aggression towards Oster and explained to Oster the importance of distancing himself from people involved in drug activity. Oster had no difficulty describing others' criminal activity during the interview. Nothing in the recording supports a finding that Oster was suffering from clear mental

disabilities during the conversation. The Court finds Oster's statements were voluntary.

## III.    Conclusion

For the foregoing reasons, Oster's Motion to Suppress (Doc. 20) is DENIED.

DATED this 7th day of July 2017.

Susan P. Watters
SUSAN P. WATTERS
United States District Judge